IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

KRISTEN AGUIRRE,

    Plaintiff,

v.

MULTIMEDIA HOLDINGS CORPORATION d/b/a KUSA-TV; and
TEGNA, INC.

    Defendants.

**COMPLAINT AND JURY DEMAND**

Plaintiff Kristen Aguirre, by and through her counsel Iris Halpern and Ciara M. Anderson of RATHOD | MOHAMEDBHAI LLC, respectfully alleges for her Complaint and Jury Demand as follows:

**NATURE OF THE CLAIMS**

Before Plaintiff Kristen Aguirre suffered an ischemic stroke that left her near death and needing to relearn how to walk, she was a highly successful news anchor on 9NEWS. Instead of accommodating Ms. Aguirre once she returned to work, Defendants ruthlessly terminated her for requesting minimal accommodations as she neared full recovery. Further, Ms. Aguirre had one more strike against her – she was also Latina. As became apparent in coming months, Defendants evidenced a pattern of hostility and disparate treatment towards women of color, ending three Latina reporters' employment at 9NEWS in quick succession.

This action arises under Title I of the American with Disabilities Act of 1990, as amended, ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981") against Defendants Multimedia Holdings Corporation d/b/a KUSA-TV ("KUSA") and TEGNA, Inc. ("TEGNA") to remedy unlawful employment practices on the basis of disability, race, and/or both, and to provide Plaintiff Kristen Aguirre appropriate relief. While 9NEWS wants to present itself as diverse and responsive to the communities it serves, Defendants cannot do so by callously violating this country's civil rights laws.

## I.    PARTIES, JURISDICTION, AND VENUE

1.  Plaintiff Kristen Aguirre is a Latina woman who, during all time periods relevant to this action, was domiciled in the State of Colorado.

2.  Defendant Multimedia Holdings Corporation is a foreign corporation duly registered with the Colorado Secretary of State that did, during all time periods relevant to this action, and continues to do, business in Colorado as KUSA-TV.

3.  Defendant TEGNA, Inc., is a foreign corporation which wholly owns Defendant Multimedia Holdings Corporation.

4.  Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1337, and 1343. This Action is authorized and instituted pursuant to 42 U.S.C. §§ 2000e-5(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 12117(a) of the Americans with Disabilities Act which incorporates Title VII's enforcement provisions, and pursuant to 42 U.S.C. §§ 1981 and 1981a.

5.  Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). The events and omissions alleged herein occurred within the State of Colorado. At the time of the

events and omissions giving rise to this litigation, all the parties resided or conducted business in Colorado.

## II. ADMINISTRATIVE EXHAUSTION

6. Plaintiff filed her initial charge of discrimination with the U.S. Equal Employment Opportunity Commission on December 23, 2020.

7. Plaintiff filed an Amended Charge of Discrimination with the U.S. Equal Employment Opportunity Commission on April 19, 2021.

8. The Charges of Discrimination included allegations of discrimination based on race, national origin, disability, as well as retaliation.

9. The EEOC issued Plaintiff a Notice of Right to Sue on September 16, 2021.

10. Plaintiff files this action within ninety (90) days of receiving her Notice of Right to Sue.

## III. FACTUAL ALLEGATIONS

### Ms. Aguirre's Career Trajectory

11. Ms. Aguirre began her news anchor and reporting career at KHQA in Quincy, Illinois in 2011. She started as the station's weekend reporter and then moved up the ranks to morning anchor.

12. In 2014, Ms. Aguirre moved to Flint, Michigan, where she worked for three years as the morning anchor at WEYI.

13. Ms. Aguirre developed a passion for sharing motivating and inspiring stories with the public.

14. Ms. Aguirre was anchoring at the peak of the Flint water crisis, and she focused her reporting on the crisis' impact on the local undocumented Latino community.

15. For her efforts, Ms. Aguirre received the Best Anchor Award from the Michigan Associated Press in 2016.

16. Ms. Aguirre also earned an Emmy nomination in 2017.

17. In September 2017, Ms. Aguirre's impressive track record of success landed her a job in Colorado anchoring and reporting at 9NEWS.

18. At 9NEWS, Ms. Aguirre anchored the news at least four times a week and completed additional reporting activities in the field.

19. As a reporter, Ms. Aguirre strived to increase visibility of the Denver Latino population, promote community-based stories, and report on immigration and women's issues.

20. With respect to her role as a reporter, Ms. Aguirre created relationships in the community and found unique and newsworthy stories showcasing segments of the population that news networks often ignore.

21. As a reporter, she often had a photographer with her, but sometimes she had to shoot and report on a story on her own.

22. Ms. Aguirre's strong connections with the Latino community also provided immeasurable value to 9NEWS, as it created a more inclusive news flow and expanded its audience.

23. Ms. Aguirre worked tirelessly to establish herself as a reputable anchor and dependable employee.

24. 9NEWS knew that it could rely on Ms. Aguirre to provide high quality stories and Ms. Aguirre earned consistent praise during her yearly reviews.

25. Each year, supervisors and colleagues provided Ms. Aguirre with positive feedback about her anchoring and reporting and commended her work ethic.

26. Within Ms. Aguirre's first year as a 9NEWS anchor, her supervisor, Linda Kotsaftis, recognized Ms. Aguirre's talent and believed she deserved a slot with increased viewership.

27. For example, Ms. Kotsaftis and other 9NEWS management asked Ms. Aguirre to anchor primary newscasts during the week when the station needed someone to fill in.

28. And, in a sign of trust and recognition of Ms. Aguirre's quality performance, in addition to Ms. Aguirre's ongoing anchoring job, Ms. Kotsaftis shifted Ms. Aguirre's reporting from daytime to nighttime appearances because viewership during those later hours is more robust.

**Ms. Aguirre's Life Changed When She Suddenly Suffered an Ischemic Stroke**

29. On April 13, 2019, Ms. Aguirre uncharacteristically failed to show up to work. When no one at work could reach her, 9NEWS called Ms. Aguirre's boyfriend who went to Ms. Aguirre's home to check on her.

30. When Ms. Aguirre did not answer the door, her boyfriend called an ambulance, and the paramedics rushed Ms. Aguirre to the emergency room.

31. Eight hours later, after performing a Magnetic Resonance Imaging ("MRI"), the doctors informed Ms. Aguirre that she had suffered a stroke.

32. Ms. Aguirre was immediately moved to the Intensive Care Unit at Denver Health.

33. Ms. Aguirre's doctors later revealed to her that she had suffered an ischemic stroke, and that she needed rehabilitation as soon as possible.

34. An ischemic stroke is when a blood clot blocks the flow of blood and oxygen to the brain, which in some cases can cause permanent brain damage or death.

35. On April 18, 2019, Ms. Aguirre was transferred to Craig Hospital, one of the top brain injury rehabilitation centers in the country, where she stayed for over two months.

36. Craig Hospital staff explained that the mobility of her arm was impacted and may never return. They also stated that she would likely need a wheelchair for the rest of her life, as her brain was not appropriately communicating with her lower extremities.

37. Fortunately, Ms. Aguirre avoided speech impairments that often flow from strokes.

38. Ms. Aguirre was devastated, but with the support of her family and her religious faith, she decided that she would give all her energy to her recovery.

39. Ms. Aguirre spent every moment she could towards learning to walk on her own, improving her strength, and working on the skills she needed to return to work.

40. Throughout her time in impatient care, several of her friends and supervisors from 9NEWS visited her and assured her that she would have a job waiting for her once she was ready to return.

41. Eric Valdez, the Director of Content, often text messaged Ms. Aguirre to confirm that she would have a job once she recovered.

42. After being discharged from Craig Hospital, Ms. Aguirre began intensive outpatient therapy with the goal of returning to work as soon as possible.

43. Ms. Aguirre successfully learned how to walk again.

44. Although she could walk, Ms. Aguirre continued to struggle with mobility in her left arm.

45. Ms. Aguirre's stroke substantially impeded her ability to perform manual tasks and take care of herself, as well as substantially limited some of her neurological and brain functions.

46. Nonetheless, Ms. Aguirre began rehearsing her evening news anchor duties in the 9NEWS studio as early as September 30, 2019 – a mere five months after her stroke.

47. By October 2019, the 9NEWS team prepared for Ms. Aguirre's return by discussing potential stories for her to run and how to publicly welcome her back.

48. On October 29, 2019, Ms. Aguirre made her official public return to 9NEWS by doing an interview for World Stroke Day and discussing live, on air, her recovery.

49. In these stories, 9NEWS staff appeared supportive of Ms. Aguirre's road to recovery.

50. 9NEWS used her story to burnish its image as a good Samaritan in the community and spread awareness about strokes. It seized upon the opportunity to brand itself as a welcoming, inclusive, and flexible company.

51. Management's attitude towards Ms. Aguirre dramatically changed when Ms. Aguirre began pushing to return to her position as an anchor and reporter and when it became clear that she would need some minor accommodations.

52. Ms. Aguirre made requests for only two reasonable accommodations: (1) to rehearse with fellow anchors and meteorologists when the studio was available and (2) to have a photographer present with her when she reported on stories due to some lingering mobility limitations with her left arm.

## As Ms. Aguirre Transitioned Back to 9NEWS, She Returned to New and Hostile Leadership Who Ultimately Terminated Her Employment

53. By the time Ms. Aguirre returned to part-time work at 9NEWS in mid-November 2019, Tim Ryan had replaced Mr. Valdez as the Director of Content.

54. Additionally, Megan Jurgemeyer had replaced Ms. Kotsaftis as Ms. Aguirre's supervisor.

55. Neither Mr. Ryan nor Ms. Jurgemeyer showed any support or visited Ms. Aguirre when she was at Craig Hospital.

56. Mr. Ryan viewed Ms. Aguirre as a burden and a problem.

57. After reviewing Ms. Aguirre's anchoring rehearsals, which took place less than six months after suffering a life-threatening ischemic stroke, Mr. Ryan informed her that her anchoring was "not for them" and that her "inflection was off."

58. This surprised Ms. Aguirre, given that her speech had not been impacted by the stroke.

59. In fact, Ms. Aguirre's only remaining deficit from the stroke was limited mobility in her left arm.

60. That Ms. Aguirre could not move her left arm much was obvious during her interviews.

61. Even though it publicly advertised itself as an accommodating work environment, 9NEWS rejected Ms. Aguirre because the aesthetics of her limited mobility no longer fit within its status quo for news anchors.

62. Instead of allowing Ms. Aguirre back on air, Mr. Ryan unilaterally moved her to a reporting position in which she would pitch and write stories.

63. As a reporter, her job continued to consist of brainstorming stories, and if one of her suggestions for a story was approved, she and a photographer would go into the field, shoot the footage, and edit it for the newscast.

64. The only accommodation Ms. Aguirre requested was that she have a photographer with her each time she went into the field, as she was unable to hold a camera with her limited mobility on her left side.

65. The Director of Reporting, Chris Vanderveen, worked closely with Ms. Aguirre and approved of all the reporting pieces she worked on before they went to Mr. Ryan and Ms. Jurgemeyer for review.

66. During the review process with Mr. Ryan and Ms. Jurgemeyer, they scrutinized Ms. Aguirre's work to a level she had never before experienced at 9NEWS.

67. In each meeting, Mr. Ryan and Ms. Jurgemeyer criticized everything from Ms. Aguirre's voice to her writing.

68. And even though Mr. Vanderveen had already approved of the stories for content, Mr. Ryan often challenged Ms. Aguirre by asking her why her stories mattered and to whom.

69. As time went on, Mr. Ryan visibly checked out during these meetings by spending time on his phone and speaking up only to comment critically on Ms. Aguirre's inflection and her "stare" into the camera.

70. These sudden hypercriticisms about Ms. Aguirre's work product reveal stereotypes and prejudice in response to Ms. Aguirre's recent health issues, though Ms. Aguirre ironically suffered no speech deficits following her stroke, nor any mental or analytic impairments.

71. Although Ms. Aguirre shot numerous stories after her return to 9NEWS, her first and only piece aired on February 2, 2020.

72. Meanwhile, 9NEWS continued to use Ms. Aguirre's story to improve its public image by purchasing a table for the 2020 PUSH Gala, Craig Hospital's biggest fundraiser of the year.

73. 9NEWS President and General Manager, Mark Cornetta, Human Resources Director, Jessica Hobbs, Mr. Ryan, Ms. Jurgemeyer, Ms. Aguirre, and her mother sat at a table together.

74. Ms. Aguirre felt exploited and uncomfortable given that, behind the scenes, she was facing severe scrutiny for the very cause 9NEWS was ostensibly supporting.

75. Two weeks later, on March 10, 2020, Ms. Aguirre had her last meeting with Mr. Ryan.

76. During the meeting, Ms. Aguirre informed Mr. Ryan of the immense amount of anxiety his scrutiny was causing her.

77. Specifically, she noted that Mr. Ryan's criticisms were noticeably harsher than those given to other 9NEWS reporters.

78. Mr. Ryan dismissed Ms. Aguirre's concerns and continued grilling Ms. Aguirre about complex aspects of the stories she reported.

79. Mr. Ryan apparently assumed that Ms. Aguirre's stroke was impacting her basic functions as he assured her that "the purpose of the current exercise [of questioning her] is to better understand the current state of your writing and reporting skills so we can determine what's possible in the near future."

80. In other words, Mr. Ryan substituted his judgment for that of Ms. Aguirre's occupational therapist—a medical professional—who had confirmed that Ms. Aguirre's brain function was back to normal.

81. At that meeting, Mr. Ryan told Ms. Aguirre that her reporting samples did not "meet our standards for broadcast" and that human resources would need to get involved, signaling his intent to terminate her employment.

82. On March 13, 2020, despite Ms. Aguirre's demonstrated ability to perform the essential functions of an anchor and reporter, 9NEWS terminated her employment.

83. Ms. Aguirre was the first of three Latina reporters let go in the months to come, including, after her, Sonia Gutierrez and Lori Lizarraga.

84. 9NEWS leadership is dominated by White men.

85. Latina news reporters like Ms. Aguirre had their voices and work trivialized in the newsroom.

86. 9NEWS routinely selected White reporters for more prized assignments and placed in the spotlight.

87. Despite the linguistic diversity amongst Latino and Hispanic communities in Colorado, 9NEWS routinely told Latina reporters to pitch their stories to Telemundo or that the stories they produced were a better fit for Telemundo than 9NEWS.

88. 9NEWS prohibited its reporters, including Ms. Aguirre, from referring to individuals without authorization to work in the United States as "undocumented workers," even though "undocumented" is standard industry usage. Instead, 9NEWS forced reporters to refer to such individuals as "here illegally" or "illegally in this country."

89. 9NEWS management made at least one Latina reporter publicly disclose to viewers her immigration status and history if she wanted to report on immigration-related stories.

90. 9NEWS often critiqued the appearances of its Latina journalists, particularly if they looked too ethnic.

91. Up until 9NEWS terminated Ms. Aguirre, the station had renewed every other reporter's contract since at least 2018.

92. Between at least the beginning of 2018 and March 2021, the only reporters 9NEWS terminated or failed to renew contracts with were Latina.

93. During this same time, 9NEWS did not terminate or refuse to renew the contracts of any White reporters.

94. Ms. Lizarraga was the last of the three Latina reporters let go by 9NEWS.

95. After 9NEWS did not renew Ms. Lizarraga's contract, she penned a *Westword* opinion piece about the racism she experienced in the newsroom.

96. The piece inspired significant public backlash against 9NEWS, and a contingency of local Latina politicians called for meetings with management.

97. 9NEWS indicated that, because of the backlash, it hired additional reporters of color and announced other changed to increase diversity in its newsroom.

98. But such changes were too late for Ms. Aguirre, who had already suffered the consequences of Defendants' discriminatory misconduct.

## IV. <u>CLAIMS FOR RELIEF</u>

**FIRST CLAIM FOR RELIEF**
**Disparate Treatment Based on Disability and/or the Need to Provide Accommodation**
**42 U.S.C. §§ 12112 (a) and (b)(5)(B)**

99. Plaintiff hereby incorporates all the paragraphs of this Complaint as though fully incorporated herein.

100. At all relevant times, Ms. Aguirre was an individual with a disability under 42 U.S.C. § 12102.

101. At all relevant times, Ms. Aguirre was qualified and able to perform the essential functions of the job, including without limitation, the anchor and reporter positions, with or without reasonable accommodation.

102. Defendants denied Ms. Aguirre employment opportunities because of her disability and/or because of the need to provide reasonable accommodation for her disabilities, in violation of Sections 102(a) and 102(b)(5)(B) of the ADA, 42 U.S.C. §§ 12112(a) and (b)(5)(B).

103. Defendants took adverse action against Ms. Aguirre by scrutinizing and terminating her employment because of her disability and/or because of the need to provide reasonable accommodation for her disabilities.

104. The effect of the practices complained of in the foregoing paragraphs has been to deprive Ms. Aguirre of equal employment opportunities because of her disabilities and/or because of the need to provide reasonable accommodations for her disabilities.

105. The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Ms. Aguirre and to deprive her of the financial and other benefits of working at 9NEWS.

106. The unlawful employment practices complained of in the foregoing paragraphs were intentional.

107. The unlawful employment practices complained of in the foregoing paragraphs were done with malice or reckless indifference to the federally protected rights of Ms. Aguirre.

**SECOND CLAIM FOR RELIEF**
**Denial of Reasonable Accommodation**
**42 U.S.C. § 12111(8)–(10)**

108. Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully incorporated herein.

109. At all relevant times, Ms. Aguirre was an individual with a disability under 42 U.S.C. § 12102.

110. At all relevant times, Ms. Aguirre was qualified and able to perform the essential functions of the job, including without limitation, the anchor and reporter positions, with or without reasonable accommodation.

111. Ms. Aguirre requested (1) to rehearse with fellow anchors and meteorologists when the studio was available and (2) to have a photographer present with her when she reported on stories.

112. 9NEWS knew of Ms. Aguirre's disabilities—that she suffered a stroke and had difficulty using her left arm.

113. 9NEWS failed to provide Ms. Aguirre reasonable accommodations.

114. Defendants denied Ms. Aguirre employment opportunities because of her disability and/or because of her request for reasonable accommodations, in violation of 42 U.S.C. §§ 12111(8) – (10).

115. The effect of the practices complained of in the foregoing paragraphs has been to deprive Ms. Aguirre of equal employment opportunities because of her disabilities and/or because of the need to provide reasonable accommodations for her disabilities.

116. The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Ms. Aguirre and to deprive her of the financial and other benefits of working at 9NEWS.

117. The unlawful employment practices complained of in the foregoing paragraphs were intentional.

118. The unlawful employment practices complained of in the foregoing paragraphs were done with malice or reckless indifference to the federally protected rights of Ms. Aguirre.

**THIRD CLAIM FOR RELIEF**
**Retaliation and Interference**
**42 U.S.C. §§12203(a) and (b)**

119. Plaintiff hereby incorporates all the paragraphs of this Complaint as though fully incorporated herein.

120. At all relevant times, Ms. Aguirre was qualified and able to perform the essential functions of the job, including, without limitation the anchor and reporter positions, with or without reasonable accommodation.

121. Ms. Aguirre engaged in a protected activity by requesting reasonable accommodations.

122. 9NEWS terminated Ms. Aguirre's employment because of her disability and because she requested reasonable accommodations.

123. Defendants interfered with Ms. Aguirre's exercise of the rights guaranteed her under the ADA.

124. Defendants' termination of Ms. Aguirre was retaliatory because of Ms. Aguirre's disability and her reasonable requests for accommodations.

125. The effect of the practices complained of in the foregoing paragraphs has been to deprive Ms. Aguirre of equal employment opportunities because of her disabilities and/or because of the need to provide reasonable accommodations for her disabilities.

126. The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Ms. Aguirre and to deprive her of the financial and other benefits of working at 9NEWS.

127. The unlawful employment practices complained of in the foregoing paragraphs were intentional.

128. The unlawful employment practices complained of in the foregoing paragraphs were done with malice or reckless indifference to the federally protected rights of Ms. Aguirre.

### FOURTH CLAIM FOR RELIEF
### Discrimination Based on Race and/or National Origin
### 42 U.S.C. 2000e *et seq.*

129. Plaintiff hereby incorporates all the paragraphs of this Complaint as though fully incorporated herein.

130. Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2 makes it an unlawful employment practice to discharge any individual or otherwise discriminate against any individual with respect to terms, conditions, or privileges of employment because of such individual's race or national origin.

131.    Ms. Aguirre is Latina and of Mexican descent.

132.    Management at 9NEWS favored White reporters and anchors, subjecting Latina and other reporters of colors to hostility and disparate treatment.

133.    Between 2018 and early 2021, the only other reporters at 9NEWS in addition to Ms. Aguirre whose contracts were not renewed were also Latina.

134.    Defendants unlawfully denied Ms. Aguirre the benefits, privileges, and terms and conditions of her employment due to her race and/or national origin.

135.    Defendants treated Ms. Aguirre less favorably than her similarly situated non-Latina counterparts.

136.    The effect of the practices complained of above has been to deprive Ms. Aguirre of equal employment opportunities and otherwise adversely affect her status as an employee because of her race and/or national origin.

137.    The unlawful employment practices complained of above were intentional.

138.    The unlawful employment practices complained of above were done with malice or reckless indifference to Ms. Aguirre's federally protected rights.

**FIFTH CLAIM FOR RELIEF**
**Discrimination Based on Race and/or Ethnicity**
**42 U.S.C. § 1981**

139.    Plaintiff hereby incorporates all the paragraphs of this Complaint as though fully incorporated herein.

140.    42 U.S.C. § 1981 guarantees all persons within the jurisdiction of the United States the same right in every State and Territory to make and enforce contracts and to the full and equal benefit of all laws and proceedings for the security of property as enjoyed by White citizens.

141. The constitutional right to be free from discrimination codified in 42 U.S.C. § 1981 prohibits racial, ethnic, and alienage discrimination in the making or enforcement of private contracts, including those inherent in the employment relationship.

142. Ms. Aguirre is Latina and of Mexican descent.

143. Ms. Aguirre belongs to a protected class under 42 U.S.C. § 1981. *See St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 611 (1987); *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 970 (10th Cir. 1979).

144. Defendants discriminated against Ms. Aguirre in violation of 42 U.S.C. § 1981 based on her race and/or ethnicity.

145. Management at 9NEWS favored White reporters and anchors, subjecting Latina and other reporters of colors to hostility and disparate treatment.

146. Between 2018 and early 2021, the only other reporters at 9NEWS in addition to Ms. Aguirre whose contracts were not renewed were also Latina.

147. Defendants unlawfully denied Ms. Aguirre the benefits, privileges, and terms and conditions of her employment due to her race and/or ethnicity.

148. Defendants treated Plaintiff less favorably than her similarly situated non-Latina counterparts.

149. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities, otherwise adversely affect her status as an employee, deprive her of her right to make and enforce contracts, and deprive her of the full and equal benefit of laws, because of her race.

150. The unlawful employment practices complained of above were intentional.

151. The unlawful employment practices complained of above were done with malice or reckless indifference to Plaintiff's federally protected rights.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Ms. Aguirre respectfully requests that the Court enter judgment for the following relief:

a. Actual economic damages as established at trial;

c. Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d. Front pay in lieu of reinstatement;

e. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g. Pre-judgment and post-judgment interest at the highest lawful rate;

h. A tax penalty offset;

i. Attorneys' fees and costs as allowed by law; and

j. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: November 11, 2021

                                                                  RATHOD | MOHAMEDBHAI LLC

                                                                  *s/ Iris Halpern*
                                                                  Iris Halpern
                                                                  Ciara M. Anderson
                                                                  2701 Lawrence Street, Suite 100
                                                                  Denver, CO 80205
                                                                  (303) 578-4400 (t)
                                                                  (303) 578-4401 (f)
                                                                  ih@rmlawyers.com
                                                                  ca@rmlawyers.com

                                                                  ATTORNEYS FOR PLAINTIFF

20